UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| EVANSTON INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 14-027-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| HOUSING AUTHORITY OF | ) | **MEMORANDUM OPINION** |
| SOMERSET, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the parties' cross-motions for summary judgment in this declaratory judgment action.[1]  [Record Nos. 37, 38]  Plaintiff Evanston Insurance Company ("Evanston") asks this Court to find that the coverage available under its insurance policy is limited to $1,000,000.00.  [Record No. 37]  Defendants Rhonda Kay Griffin, individually, as Co-Administrator of the Estates of Kaitlyn Griffin and Nicholas Ayden Steele, and as Administratrix of the Estate of Derel Griffin; Jason Steele, individually and as Co-Administrator of the Estate of Nicholas Ayden Steele; and Robin Mullins, mother and next friend of Joshua Thacker, a minor (collectively, the "defendants" or the "state court plaintiffs"), contend that $2,000,000.00, or, alternatively, $4,000,000.00, is available under Evanston's policy.  [Record No. 38]  The coverage available will determine Evanston's

---

[1]   The defendants have filed a motion [Record No. 55] to strike the affidavit of Kent Latham, which Evanston attached to its Reply in support of its motion for summary judgment. [Record No. 47-1]  As discussed, resolution of this matter is purely a question of law. The parties have not requested a period of discovery and the Court has not permitted evidence outside of the stipulated record.  Accordingly, the motion to strike will be granted.

-1-

payment to satisfy a judgment that the state court plaintiffs obtained against Evanston's insured, the Housing Authority of Somerset, for wrongful death, physical injury, and loss of consortium claims in a state court action. For the reasons discussed below, the coverage available under Evanston's insurance policy is limited to $1,000,000.00. As a result, summary judgment will be entered in favor of Evanston on all claims.

I.

A.     The State Court Action

This case follows a personal injury trial in Somerset, Kentucky. Kaitlyn Griffin and her cousin, Joshua Thacker, were unloading a motor vehicle in a common area maintained by the Housing Authority of Somerset ("Housing Authority") on December 9, 2009, when a large maple tree fell on them. Both Kaitlyn and Joshua were minors at the time. Kaitlyn was pregnant and died instantly or within several minutes after the tree fell due to blunt force trauma to her head and upper body. [Record No. 32-5, p. 585[2]] Her official time of death was stated as 2:05 p.m. [Record No. 32-5, p. 585] Her son, posthumously named Nicholas Ayden Steele, was born via emergency Caesarean section. [Record No. 32-4, p. 573] He was 26 to 27 weeks gestation at the time. [Record No. 32-4, p. 573] Nicholas died from cardiorespiratory arrest at 3:05 p.m., almost an hour after his birth. [Record No. 34-3, p. 758]

Joshua sustained injuries to his head, back, neck, legs, and shoulder, requiring treatment at Lake Cumberland Hospital, Shriner's Hospital, and the White House Clinic. He was still undergoing physical therapy treatment at the time of trial. Joshua also required

---

[2]     Unless otherwise noted, the page numbers refer to the Page Identification Number assigned when filed in the record.

mental health treatment following the incident. [Record No. 31, Trial DVD No. 2, Oct. 22, 2013; 02:25:55–02:46:57]

At the conclusion of the state trial, the jury found that the Housing Authority breached its duty to exercise ordinary care to maintain its common areas in a reasonably safe condition for its tenants and their guests. [Record No. 32-2, pp. 486–507] It awarded damages to the Estate of Kaitlyn Griffin in the amount of $1,261,486.00, damages to the Estate of Nicolas Ayden Steele in the amount of $1,254,792.00, and damages to Robin Mullins, mother and next friend of Joshua Thacker, in the amount of $220,000.00. [*Id.*] Additionally, for each of their consortium claims, the jury awarded Rhonda Kay Griffin $250,000.00, Derel Griffin $250,000.00, and Jason Steele, the father of Nicholas Ayden Steele, was awarded $500,000.00. [*Id.*] The total judgment against the Housing Authority was $3,736,278.00.

The state court plaintiffs attempted to name Evanston as a party to the state court action for purposes of collecting the judgment and asserting bad faith claims following the trial. During mediation, the parties agreed that Evanston would pursue declaratory judgment in this forum to determine the amount of coverage available.

      **B.**    **The Federal Court Action**

Because the parties dispute the amount of coverage available under the policy, Evanston filed this declaratory judgment action and the state court plaintiffs, who are the defendants herein, filed a counterclaim. Evanston concedes that $1,000,000.00 is available under the policy and paid that amount to the state court plaintiffs as part of the mediation agreement. However, the state court plaintiffs contend that there is $2,000,000.00 or $4,000,000.00 available under policy. The issue for resolution by this Court is whether the

policy issued by Evanston to the Housing Authority provides more than $1,000,000.00 in coverage under the circumstances presented through the state court action.

## II.

Summary judgment is appropriate when there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

There are two "coverage parts" to the Evanston policy purchased by the Housing Authority. Coverage Part A, entitled "Public Liability," provides general liability coverage for bodily injury, personal or advertising injury, or property damages for which the Housing Authority is deemed liable. [Record No. 34-4, p. 770][3] Coverage Part B, entitled "Public Officials Liability," affords coverage for "wrongful acts." [Record No. 34-4, p. 792] "Wrongful acts" are defined in Coverage Part B as "any actual or alleged error, misstatement

---

[3] The parties have attached two copies of the Evanston policy at issue. [Record Nos. 30-1, 34-4] For ease of reference, only the copy located at Record No. 34-4 and its corresponding page numbers will be referenced.

or misleading statement, act or omission, neglect, negligence, or breach of duty" by a Housing Authority official or employee while acting within the course and scope of his or her employment. [Record No. 34-4, p. 804]

The declarations page of the Evanston Insurance policy provides, under Item 3 entitled "Limit(s) of Insurance" [Record No. 34-4, p. 760], as follows:

| | | |
|---|---|---|
| Coverage Part A | $2,000,000 | Coverage Part Aggregate Limit |
| | $1,000,000 | Each occurrence as defined by the Public Liability Coverage Part |
| Coverage Part B | $2,000,000 | Coverage Part Aggregate Limit |
| | $See Endorsement | Each claim as defined by the Public Officials Liability Coverage Part. |

Under Part A, Evanston agreed to indemnify "the Insured [Defendant Housing Authority] for the ultimate net loss in excess of the retained limit shown on the Declarations Page for which the Insured becomes legally obligated to pay because of bodily injury, personal and advertising injury, or property damage to which this insurance applies." [Record No. 34-4, p. 770 (emphasis removed)] Here, the Housing Authority has paid the listed retained limit of $150,000 during the underlying state court litigation. Further, the Housing Authority's obligation to pay for bodily injury has been determined by a judgment against it after a contested suit, as further described in the policy. [Record No. 34-4, p. 770]

The issue before the Court is whether the available limit is $1,000,000 under the policy, as argued by Evanston, or some greater amount, as argued by the defendants. Within this question are several related questions, including: (i) whether the aggregate limit is available under Part A based on the definition of "occurrence" in the policy; (ii) whether

coverage is available, and in what amount, under Part B; (iii) whether coverage is available under Parts A and B of the policy.  The next issue presented is whether there was more than one occurrence or claim under the applicable Part of the policy.

The relevant portion of Part A of the policy states that an:

Occurrence means:

1. With respect to bodily injury and property damage, an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

[Record No. 34-4, p. 787, § R (emphasis removed)]   Occurrence and accident are not otherwise defined within Part A.  The defendants argue that, because the term is not defined further, the Court should consider case law suggesting that the policy limits clause refers to the effect or result of the accident or occurrence, meaning that each victim would be entitled to the per occurrence policy limit of $1,000,000.

The declaration page relevant to Part B refers to an aggregate limit of $2,000,000.00. However, the limit for each "claim" cross-references the applicable endorsement, rather than a specific amount.  Evanston points to Endorsement No. 2 as stating the applicable limits, although Endorsement No. 2 is not specifically referenced in the Declarations Page. Endorsement No. 2, however, does not reference a "claim" limit, but states a "Per Occurrence Limit/Aggregate" of $1,000,000/$2,000,000.  [Record No. 34-4, pp. 830–32]

Under Part B, Evanston agreed to similar indemnification provisions as included under Part A.  Evanston agreed to indemnify "the Insured [Defendant Housing Authority] for loss in excess of the retained limit shown on the Declarations Page that the Insured becomes legally obligated to pay because of a wrongful act(s) to which this insurance applies." [Record No. 34-4, p. 792, § I (A) (1) (emphasis removed)]   Thus, Part A applies to "each

-6-

occurrence" "because of bodily injury," and Part B coverage is determined by "each claim" alleging a "wrongful act(s)." Part B defines claim as follows:

> Claim(s) means an oral or written demand or notice received by an Insured containing an allegation of wrongful act(s) committed by and seeking damages against an Insured. Claim(s) shall include civil proceedings, arbitration, other alternative dispute resolutions, or other legal proceedings. Claim(s) shall also include a charge or complaint filed with the EEOC or its state or local equivalent containing an allegation of employment wrongful act(s) committed by an Insured . . . .

[Record No. 34-4, p. 802, § V (E) (emphasis removed)] "All claim(s) based on or arising out of the same wrongful act(s), or a series of related wrongful act(s), by one or more insureds . . . shall be considered a single claim." [Record No. 34-4, p. 793, § I (A)(4) (emphasis removed)] Part B states that "[o]nly one retained limit and one each claim [l]imit(s) of [i]nsurance shall be applicable to all such claim(s)." [*Id.* (emphasis removed)]

> Wrongful act means any actual or alleged error, misstatement or misleading statement, act or omission, neglect, negligence, or breach of duty by you or any Insured while acting solely within the course and scope of your employment and only while performing employment-related duties on your behalf. Wrongful act shall also include such acts in the administration of an employee benefit program and employment wrongful act(s).

[Record No. 34-4, p. 804, §V (AA) (emphasis removed)]

### A. The Policy Provides Coverage Under Part A (Public Liability), Rather Than Part B (Public Officials Liability) or Both Parts A And B.

Part A and Part B of the policy contain provisions addressing the interplay between the two types of coverage. Section III(E) of Part A provides:

> If any occurrence covered in whole or in part under Coverage Part A of this policy (or any preceding or succeeding policy issued by the company or any of its subsidiaries and affiliates) also constitutes a wrongful act(s) covered in whole or in part under Coverage Part B of this policy (or any preceding or succeeding policy issued by the company or any of its subsidiaries and affiliates), then only the Coverage Part with the higher limits **either for the each occurrence (Coverage Part A) or for each claim(s) (Coverage Part B)**

> **as listed on the Declarations Page or any Endorsement** (and its corresponding retained limit) will apply to the entire claim **or suit**. If the each occurrence (Coverage Part A) and the each claim(s) (Coverage Part B) Limit(s) of Insurance as listed on the Declarations Page or any Endorsement are equal, only one limit will still apply to the entire claim or suit and it will be the each occurrence (Coverage Part A) Limit(s) of Insurance and its corresponding retained limit.

[Record No. 34-4, p. 783 (existing emphasis added, original emphasis removed)]

Similarly, Section III(E) of Part B provides:

> If any occurrence covered in whole or in part under Coverage Part A of this policy (or in any preceding or succeeding policy issued by the company or any of its subsidiaries or affiliates) also constitutes a wrongful act(s) covered in whole or in part under Coverage Part B of this policy (or in any preceding or succeeding policy issued by the company or any of its subsidiaries or affiliates), then only the Coverage Part with the higher limits (and its corresponding retained limit) will apply to the entire claim(s). If the applicable limits of each coverage part are equal, only one limit, the each occurrence Limit(s) of Insurance of Coverage Part A (and its corresponding retained limit), will apply to the entire claim(s).

[Record No. 34-4, p. 800 (emphasis removed)]

With two exceptions, the first sentences of these two provisions are identical. The words in bold in Part A are not included in Part B and Part B includes a reference to plural "claims." The second sentence of Sections III(E) in Parts A and B contain similar, but not identical, language.

The defendants parse through a number of different interpretations of the two separate sentences in Sections III(E) of Parts A and B in an effort demonstrate that the provisions are internally ambiguous and also to attempt to create ambiguity between the two Sections, none of which is persuasive. *See State Auto Ins. Co. v. Stinson*, 142 F.3d 436, at *3 (6th Cir. 1998) (unpublished table decision) (quoting *Transport Ins. Co. v. Ford*, 886 S.W.2d 901, 905 (Ky. App. 1994)) ("The mere fact that language in an insurance policy may have more than

one meaning does not automatically make the policy ambiguous. Under Kentucky law, '[t]to determine that an ambiguity exists, the court must first determine that the contract provision is susceptible to *inconsistent* interpretations.'"). These Sections, considered alone or in comparison, are not susceptible to different or inconsistent interpretations so as to make them ambiguous. *Cantrell Supply Inc. v. Liberty Mutual Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (citing *Transport*, 886 S.W.2d at 905).

The Court concludes that Sections III(E) of Part A and Part B of the policy operate to limit coverage in this case to Part A of the policy. Assuming that this event would be covered under both Coverage Part A and Part B, as the parties do, the limits of insurance are identical for both Part A and Part B.[4] Further, the definitions in Part A and Part B do not suggest that different limits would apply under Part B as opposed to Part A.[5] In other words, this is not a scenario where the aggregate limit applies under one coverage Part, but the per occurrence or per claim limit would apply based on the other coverage part, so as to create a disparity in the coverage limits under Part A and Part B. The coverage limits under Part A

---

[4] Although Evanston referenced the "bodily injury" exclusion of Part B in its Complaint, Evanston has not developed any argument regarding this exclusion in its motion for summary judgment and related briefing and it is considered waived.

[5] As noted above, Part B indicates that all claims based on or arising out of the same wrongful acts by one or more insureds will be considered a single claim and that only the single claim limit of insurance will apply. [Record No. 34-4, p. 793, § I (A)(4)] Thus, applying the terms of Part B to the state court litigation, only the single limit of insurance, rather than the aggregate limit, applies. Although the state court defendants argue that they presented more than one claim based on the definition of "claim" in the policy [Record No. 34-3, p. 802, § 5 (E)], the coverage provisions [Record No. 34-4, p. 793, § I (A)(4)] of Part B clearly provide that even more than one claim, if based on one or a series of related wrongful acts, will be limited to the single claim limit. Accordingly, in application, the same limits would apply under Part A or Part B of the policy.

and Part B are equal and, in that circumstance, Sections III(E) of Parts A and B of the Evanston policy provide that only coverage under Part A will apply.

The defendants first contend that the difference in the language used in these two sections creates ambiguity that must be construed in their favor. The defendants argue that is unclear which of the two provisions controls: Part A's Section III(E) or Part B's Section III(E). They contend that the distinction is material because Part B's Section III(E) is "more ambiguous and permissive of a finding of dual coverages than Part A's section III(E)." [Record No. 48, p. 998] However, the meaning of both clauses is the same, despite the minor discrepancies in the language used. In both Parts A and B, the first sentence of provides that if any given event qualifies for coverage under both Parts of the Evanston policy, then coverage will be provided under whichever part allows for the highest limit of insurance. The second sentence of Section III(E) of both Parts A and B provides that if the limits of insurance are the same for both parts, then the provisions of Part A will apply. While the defendants point to discrepancies among the terms used in the two parts, none of those discrepancies creates a material difference to the interpretation of the reasonable meaning of these sections.

The defendants also argue that there is no "claim" limit of insurance available under Part B because the limit contained in Endorsement No. 2 is a "per occurrence" and "aggregate" limit, rather than a "per claim" limit. If there is no "claim" limit, then the applicable limits under Parts A and B are not equal. While other coverage parts have specific amounts listed on the declaration page [Record No. 34-4, p. 760], the "each claim" limit refers the reader to an unidentified endorsement. To determine the each claim limit, Evanston points to Endorsement No. 2 [Record No. 34-4, pp. 830–32] which lists a number

of different Housing Authorities across the Commonwealth of Kentucky and lists their "Per Occurrence/Aggregate" limits. For the Housing Authority of Somerset, the Per Occurrence/Aggregate limit is listed as $1,000,000/$2,000,000. While the defendants cast doubt on whether Endorsement 2 is actually the relevant endorsement, the document clearly refers to Coverage Part B and the defendants have not pointed to any other endorsement as a reasonable alternative.

Although the defendants emphasize that Endorsement No. 2 lists a limit for "per occurrence" only, rather than "per claim" or "per wrongful act" (which are the phrases used in Coverage Part B), Endorsement No. 2 otherwise clearly refers to Coverage Part B. The only explanation for the "per occurrence" limit in Endorsement No. 2 is that it is meant to correspond to the "per claim" described in Coverage Part B. There's no alternative meaning for the phrase "per occurrence" other than the single types of events or claims addressed by Coverage Part B. In this regard, the Court notes that "'[a]ny contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible.'" *Cantrell Supply*, 94 S.W.3d at 384–85 (quoting *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (1986)). And here, the defendants have not offered an alternative meaning for the "per occurrence" limit. To construe it, and the "per claim" limit referenced in the declaration page, as having no meaning at all is inconsistent with the principles of contract interpretation where there is a single and reasonable interpretation for the term. Thus, the meaning of "per occurrence" in Endorsement No. 2 is consistent with its application as the per claim coverage limit in the declaration page.

Reading the policy as a whole, and giving effect to it in its entirety, there is only one reasonable interpretation of Sections III(E) of Part A and Part B of the policy. *See id.* Under

the terms of the policy, if an occurrence is covered under both Part A and Part B, then either Coverage Part A or Coverage Part B, whichever has the higher limit applies. If an occurrence is covered under both Part A and Part B are the same, then only Coverage Part A applies.

The coverage limits under Part A and Part B are equal on both the face of the policy and as applied to the facts of this case.[6] In that circumstance, the Evanston policy clearly provides that only coverage under Part A will apply.

### B. Under Part A of the Policy, There was One Occurrence Giving Rise to Coverage.

An occurrence is defined in Part A of the policy as, "with respect to bodily injury and property damage, an accident, including continuous or repeated exposure to substantially the same general harmful conditions." [Record No. 34-4, p. 787, § R] Occurrence and accident are not otherwise defined within Part A.

> The words "accident," "accidental," and "accidental means," as used in insurance policies, have never acquired a technical meaning in law, and must be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured. *Donohue v. Washington Nat. Ins. Co.*, 259 Ky. 611, 82 S.W.2d 780 (1935). An accident is generally understood as an unfortunate consequence which befalls an actor through his inattention, carelessness or perhaps for no explicable reason at all. The result is not a product of desire and is perforce accidental. Conversely, a consequence which is a result of plan, design or intent is commonly understood as not accidental.

*Fryman for Fryman v. Pilot Life Ins. Co.*, 704 S.W.2d 205, 206 (Ky. 1986).

---

[6] Evanston describes a hypothetical example where different limits could apply if it had previously paid any amounts for previous occurrences or claims under either Part A or Part B of the policy earlier in the coverage period. In that scenario, the limits for Parts A and B would have been the same on the face of the policy, but coverage under one of the Parts would be reduced by the amount already paid out by Evanston earlier in the coverage period.

The terms "accident" and "occurrence" are not ambiguous. *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 507–08 (6th Cir. 2003) (interpreting a commercial general liability policy with a definition of "occurrence" identical to the definition used in the Evanston policy); *see Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 73–74 (Ky. 2011) ("We do not find the terms 'accident' or 'occurrence' to be ambiguous."). The Court of Appeals of Kentucky has relied on the average man's understanding of "accident" to analyze the definition of "occurrence" in policies where the term "occurrence" was not otherwise defined. *Westfield*, at 508 (citing *Thompson v. W. Am. Ins. Co.*, 839 S.W.2d 579, 580 (Ky. Ct. App. 1992)). "Where the terms of an insurance policy are clear and unambiguous, the policy will be enforced as written." *Kemper Nat'l Ins. Co. v. Heaven Hill Distilleries*, Inc., 82 S.W.3d 869, 873 (Ky. 2002).

Having determined that the terms "occurrence" and "accident" are not ambiguous, the Court must next identify the "occurrence" at issue and determine whether there was more than one occurrence under the terms of the policy. *See Westfield*, 336 F.3d at 508 (citing *Farmers Alliance Mut. Ins. Co. v. Salazar*, 77 F.3d 1291, 1295 (10th Cir. 1996) ("Before we apply the policy's definition of 'occurrence,' we must first decide what event or events in the causal chain leading to [the inquiry] should be the focus of our inquiry.")). The parties agree that there was at least one "occurrence" within the meaning of the term under Part A. The defendants argue, however, that there was more than one occurrence and the Evanston policy provides coverage up to the aggregate limit under Part A, which is $2,000,000.00.

Although the Supreme Court of Kentucky has recognized that "the term 'occurrence' is to be broadly and liberally construed in favor of extending coverage to the insured," *Westfield*, 336 F.3d at 510 (quoting *Brown Found., Inc., v. St. Paul Fire & Marine Ins. Co.*,

-13-

814 S.W2d 273, 278 (Ky. 1991)), Kentucky courts have not suggested that the definition of "occurrence" should be construed so as to increase the monetary limit of insurance in instances where coverage has already been established. The policy must still be given its "plain meaning" and courts may not "enlarg[e] the risks contrary to the natural and obvious meaning of the insurance contract." *Walker v. Econ. Preferred Ins. Co.*, 909 S.W.2d 343, 346–47 (Ky. Ct. App. 1995).

The defendants argue that the "occurrence" or "accident" as defined in the policy relate to the time, location, and specific cause of injury and may be determined by the number of individuals harmed. Relying on language from *Fryman* indicating that an "accident" is "tantamount" to a "consequence," language cited in *Monticello Ins. Co. v. Kentucky River Cmty. Care, Inc.*, 173 F.3d 855, at *4 (6th Cir. 1999) (unpublished table opinion), indicating that "occurrence" relates to the "time when a claimant is injured," and *Westfield*'s reference to "an event" as part of "ordinary meaning of the term of 'accident,'" they contend that Kentucky follows the "effects theory" or the "effect view." *See Banner v. Raisin Valley, Inc.*, 31 F. Supp. 2d 591, 593 (N.D. Oh. 1998) (addressing the "causation view," "effect view," and "liability triggering event view"); *see also* Michael P. Sullivan, Annotation, What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Occurrence, 64 A.L.R. 4th 668 (1998). In other words, the defendants assert that Kentucky courts do not look to the cause of accident but to the result or effect to determine the number of accidents or occurrences, which means that each harmed individual is entitled to the per occurrence or accident limits. The defendants point to the separate existences, separate experiences, and separate injuries of the individual defendants, noting that there were two wrongful deaths,

one bodily injury, and three losses of parental consortium, as separate occurrences entitled to the per occurrence limit. They argue that the parental consortium claims are separate and independent from the wrongful death claims. Additionally, Nicholas's death, which occurred in the hospital as a result of cardiorespiratory arrest an hour after his mother died as a result of blunt force trauma, are separate events and, therefore, separate occurrences.

Both Kentucky and a majority of courts that have considered this issue, however, have adopted the "cause theory." *See* 64 A.L.R. 4th 668, § 2[a]. These courts determine whether more than one occurrence or accident has occurred by looking to the cause or causes of the accident or occurrence. *Id.* The third group of courts has used the "triggering event" theory by concluding that the phrase "per occurrence" refers to the act or acts of the insured which subjected it to liability. *Id.*

As noted, Kentucky courts "look[] to the cause of the event rather than its effect in determining whether there has been a single 'occurrence' or 'accident' under an insurance policy." *Gateway Ins. Co. v. Sec. Taxicab, Inc.*, Civil Action 5:02cv237-R, 2003 U.S. Dist. LEXIS 27536, at *40 (W.D.Ky June 19, 2003) (relying on *Continental Ins. Co. v. Hancock*, 507 S.W.2d 146, 152 (1973)). The Court in *Gateway* addressed whether one or more "accidents" had occurred within the language of the policy based on an employer's negligent hiring, retention, and supervision. While the cause of action against the insured in *Gateway* differs from that here, the conclusion that Kentucky analyzes the cause of the event to determine the number of occurrences is consistent with this Court's reading of the relevant Kentucky cases. "[M]ultiple injuries with a single cause do not constitute multiple occurrences." *Id.* A "continued failure" to remedy ongoing negligence, without more, does not "transform what is essentially a single 'accident' into multiple 'accidents.'" *Id.* To

interpret "accident" or "occurrence" in this way, as the defendants prefer, would "essentially transform the passage of time" itself into an "accident." *Id.*

While not specifically finding that the effects theory approach would be used, the relevant Kentucky cases are consistent with application of the effects theory. *Gateway* considered the decision of the Court of Appeals of Kentucky, the highest court in Kentucky at the time, in *Hancock*. *Gateway,* 2003 U.S. Dist. LEXIS 27536, at *40. The issue in *Hancock* was whether three victim's injuries incurred during a fight with a nightclub owner and his employees were the result of one or more "occurrences." *Hancock*, 507 S.W.2d. at 152. The policy provided that "all bodily injury . . . arising out of continuous exposure to substantially the same general conditions shall be considered as arising out of one occurrence," which is similar to the definition used by the Evanston policy. *Id*. The Kentucky court succinctly concluded that there was only one occurrence and coverage under the policy was limited to per occurrence limit, which is consistent with the "cause theory." *Id.* If the Kentucky court had chosen to apply the effects theory, the *Hancock* court would have analyzed the question differently.

Similarly, in *Monticello*, the United States Court of Appeals for the Sixth Circuit was called upon to determine the timing of an "occurrence" for purposes of deciding which policy applied during the relevant period. *Monticello*, 173 F.3d 855, at *4. Kentucky River Community Care ("Kentucky River") placed Bill Creech in the home of the victim in 1988. *Id.* at *1. Approximately two years later, in 1990, Creech molested and sodomized the victim. The court determined that Creech's actions constituted the "occurrence" resulting in injury and which determined the relevant date, rather than the date that Kentucky River initially placed Creech in the victim's home. *Id.* at *4 (citing 43 Am. Jur. 2d Insurance §

243. ("'time of occurrence of an accident' is when complaining party was actually damaged and not the time when the wrongful act was committed.")). While *Monticello* determined when an "accident" or "occurrence" took place, rather than whether more than one occurrence took place, its findings are consistent with the cause theory. Analyzing a similar definition to that used in the Evanston policy,[7] the court noted that "Creech's *actions* constitute the occurrence resulting in injury, and it is the date at which these *acts* alleged occurred that determines the applicable policy." *Id.* (emphasis added). However, the injuries to the victims occurred contemporaneously with Creech's actions. Thus, while not definitive of the approach used, the approach in *Monticello* is consistent with Kentucky's application of the cause theory. Further, the defendants have failed to identify any Kentucky authority which persuades this Court that the Supreme Court of Kentucky would apply the effects theory.

Applying the "cause theory," the defendants argue that this Court should find that there were multiple occurrences. They rely on a Florida case, *Koikos v. Travelers Ins. Co.*, 849 So.2d 263 (Fla. 2003), which applied the "cause theory" to determine that two separate gunshots were two occurrences.[8] The Florida court noted that "using the number of shots fired as the basis for the number of occurrences is appropriate because each individual shooting is distinguishable in time and space." *Koikos*, 849 So.2d at 272 (citation omitted). Consequently, the defendants argue that the wrongful deaths of Nicholas and Kaitlyn were

---

[7] The contract in *Monticello* defined "occurrence" as "an accident, including continuous or repeated exposure conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Monticello*, 173 F.3d at *4.

[8] The *Koikos* policy defined "occurrence" in the same manner as it is defined in the Evanston policy. *Koikos*, 849 So.2d at 266.

likewise distinguishable in time and space and, therefore, two separate occurrences. [Record No. 38-1, p. 888]

This conclusion misconstrues the logic in *Koikos*, however. Looking at the time and space of the wrongful deaths that resulted from the accidents is not the relevant inquiry, but represents an application of the effect theory. The relevant inquiry is to look to the accident or accidents causing the injury. *See Real Legacy Assurance Co., Inc. v. Afif*, 409 F. App'x 558, 561 (3d Cir. 2011) (citation omitted) (applying the cause theory to determine that "the fact there were multiple injuries and they were of different magnitudes and that injuries extended over a period of time does not mean that there were multiple occurrences"); *Flemming v. Air Sunshine, Inc.*, 311 F.3d 282, 295 (3rd Cir. 2002) (finding that the plane crash was "one constant, uninterrupted cause," or occurrence, that eventually led to the decedent's death, despite the fact that there were other negligent acts relating to the crash); *Ware v. First Specialty Ins. Corp.*, 983 N.E.2d 1115, 1122 (Ill. App. 2013) (finding that the collapse of the deck on which the victims were standing was a single occurrence for purposes of the limit of insurance irrespective of the time that the victim's injuries manifested or their deaths resulted).

Here, only one tree fell. Applying the cause theory to the relevant facts, there was only one occurrence under the policy. There was only one "independent immediate" act or accident that gave rise to the injuries in this case and, therefore, only one occurrence. *Koikos*, 849 So.2d at 273. Every injury flowed from the tree striking Joshua and Kaitlyn. Thus, the facts here are more similar to *United Servs. Auto. Ass'n v. Neary*, in which the Supreme Court of Alaska found that a single gunshot that struck two victims qualified as one single occurrence for purposes of the limit of liability under the insurance policy. 307 P.3d

907, 912–15 (Alaska 2013). That court rejected the application of the "effects theory" and the argument that the number of injuries—to the two children and the four distressed parents of the two children—controlled the number of occurrences.[9] *Neary*, 307 P.3d at 914. The accident in this case, a single tree falling and striking more than one victim resulting in physical and emotional impacts on additional victims, is similar to the single gunshot in *Neary*.

One tree caused bodily injuries to Jason and the deaths of Kaitlyn and Nicholas, but the falling tree was the only occurrence under the terms of the Evanston policy under Kentucky law. "[T]he time at which injuries manifest themselves is irrelevant to a determination of the number of occurrences [under the cause theory]. The only relevant question is how many separate events or conditions led to a party's injuries." *Ware*, 983 N.E.2d at 1121 (citations omitted). As a result, only the per occurrence limit of $1,000,000.00 under Part A is available as coverage under the Evanston policy.

### IV.

Based on the foregoing analysis, it is hereby

**ORDERED** as follows:

1. The defendants' motion [Record No. 55] to strike the affidavit of Kent Latham is **GRANTED**.

2. The defendants' motion [Record No. 38] for summary judgment is **DENIED**.

---

[9] In rejecting the "effects theory," the court noted that "a majority of courts that have considered the effects test as a way to determine the number of occurrences have rejected it as unworkable." *Neary*, 307 P.3d at 914. "[T]he [effects] test renders insurers' liability both unpredictable and limitless, since any one event can cause many injuries to many people." *Id.* at 915.

3. The plaintiff's motion [Record No. 37] for summary judgment is **GRANTED**.

This 8th day of December, 2015.



Signed By:
*Danny C. Reeves* DCR
United States District Judge